IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

THELMA J. HANDSON,                )
                                  )
              Plaintiff,          )
                                  )
      v.                          )  Case No. 06-0832-CV-W-REL-SSA
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of Social            )
Security,                         )
                                  )
              Defendant.          )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Thelma J. Handson seeks review of the final

decision of the Commissioner of Social Security denying

plaintiff's application for disability benefits under Title II of

the Social Security Act ("the Act"), 42 U.S.C. §401, <u>et seq.</u>, and

her application for SSI benefits under Title XVI of the Act, 42

U.S.C. §1381 <u>et seq.</u>[1]  Plaintiff argues that the administrative

law judge ("ALJ") (1) failed to properly consider plaintiff's

mental impairment; (2) failed to properly evaluate her subjective

complaints; and (3) failed to pose an adequate hypothetical

question to the vocational expert.  I find that the substantial

---

[1]This application was filed after plaintiff's prior
application for a period of disability, disability insurance and
supplemental security income was denied by a Social Security ALJ
on July 2, 2002 (Tr. 88-93).  After the Appeals Council affirmed
the ALJ's decision, plaintiff filed a civil complaint in federal
district court seeking a review of the Commissioner's decision,
and on May 11, 2004, the Honorable Gary A. Fenner, U.S. District
Judge, affirmed the Commission's decision (Tr. 315-22).  During
the administrative hearing on this application, plaintiff's
counsel conceded that Judge Fenner's decision is *res judicata* as
to the evidence available prior to July 2, 2002 (Tr. 38-41).

evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On February 11, 2003, plaintiff applied for disability insurance and SSI benefits alleging that she had been disabled since July 3, 2002. Plaintiff's disability stems from asthma and high blood pressure. Plaintiff's application was denied on April 3, 2003. On December 17, 2004, a hearing was held before an Administrative Law Judge. On January 27, 2005, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On August 9, 2006, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether

2

the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

**III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS**

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has

3

lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that She is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Griffon v. Bowen, 856 F.2d 1150, 1153-54 (8th Cir. 1988); McMillian v. Schweiker, 697 F.2d 215, 220-21 (8th Cir. 1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.  Is the claimant performing substantial gainful activity?

    Yes = not disabled.
    No = go to next step.

2.  Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

    No = not disabled.
    Yes = go to next step.

3.  Does the impairment meet or equal a listed impairment in Appendix 1?

    Yes = disabled.
    No = go to next step.

4

4.  Does the impairment prevent the claimant from doing
    past relevant work?

    No = not disabled.
    Yes =  go to next step where burden shifts to Com-
    missioner.

5.  Does the impairment prevent the claimant from doing any
    other work?

    Yes = disabled.
    No = not disabled.

## IV.  *THE RECORD*

The record consists of the testimony of plaintiff and her
boyfriend and vocational expert Lesa Keen, in addition to
documentary evidence admitted at the hearing.[2]

### A.  *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

**1.  Earnings Report.**

Plaintiff's earnings from employment are reflected for the
years below:

| | |
|---|---|
| 1977 | $    446.20 |
| 1978 |      694.30 |
| 1979 |      487.08 |
| 1980 |      214.00 |
| 1981 |    1,378.54 |
| 1982 |      865.37 |
| 1983 |      816.02 |
| 1984 |      227.81 |
| 1985 |    1,754.58 |
| 1986 |       69.20 |
| 1987 |    4,165.52 |
| 1988 |    5,603.00 |
| 1989 |    2,734.88 |

---

[2]The facts here are largely uncontested by the parties. (See
Government's Brief, page 2.)

5

```
1990          7,231.34
1991          9,178.85
1992          8,627.37
1993         10,914.98
1994         16,126.10
1995         18,316.57
1996         18,519.87
1997         20,342.93
1998         21,366.72
1999         18,079.24
2000            953.20
```

(Tr. 141, 365.)

### 2.   Application for Benefits.

On February 11, 2003, plaintiff filed her current application for supplemental security income (Tr. 752-55).  In the application she reported that she became disabled on July 3, 2002 (Tr. 752).

### 3.   Prior ALJ Decision.

On July 2, 2002, the Honorable William E. Zleit, Administrative Law Judge (ALJ), entered a decision denying plaintiff's earlier applications for disability benefits and SSI benefits based on disability (Tr. 88-93).  The ALJ made the following findings of fact:

> 1.   Claimant meets the non-disability requirements for a Period of Disability and Disability Insurance Benefits set forth in the Social Security Act for benefits through the date of this decision.
>
> 2.   Claimant has not engaged in substantial gainful activity since the alleged onset of disability (i.e., October 24, 1999).
>
> 3.   Claimant has an impairment or combination of impairments considered severed under the Regulations.

6

4.    Claimant's impairments do not meet or medically equal one of the listed Impairments under Appendix I, Subpart P, Regulation No. 4.

5.    Claimant's allegations regarding her limitations are not totally credible for the reasons described in the decision.

6.    The ALJ considered all the medical opinions in the record dealing with the severity of claimant's impairments.

7.    Claimant has the residual functional capacity to do sedentary work provided that she has the option to sit or stand and can work in a clean, environmentally controlled site; and plaintiff has the capacity to perform light, physically non-stressful work.

8.    Claimant's past relevant work includes employment as a supply clerk, school bus driver, child-care provider, and equipment operator, which did not require the performance of work-related activities precluded by her residual functional capacity.

9.    Claimant's medical determinable back pain, hypertension, asthma, sleep apnea, right leg swelling, shortness of breath, and dizziness do not prevent her from performing relevant light work or other sedentary sit/stand work such as security monitor, information clerk, and telephone solicitor, which exist in significant numbers in the national economy.

10.   Claimant was not disabled as defined by the Social Security Act, for anytime through the date of this decision.

(Tr. 92-93.)

**4.   Prior District Court Decision.**

On May 11, 2004, the Honorable Gary A. Fenner, U.S. District

Judge for the Western District of Missouri, entered an order

affirming an ALJ's July 2, 2002, decision to deny plaintiff's

7

earlier applications for disability benefits and SSI benefits
based on disability (Tr. 315-21).

   **5.    Disability Report-Adult.**

   On February 14, 2003, plaintiff completed a Disability
Report in which she stated that she is unable to work because of
asthma and high blood pressure (Tr. 372-78).  She explained that
she cannot breath when she is around certain smells, she gets
tightness in her chest, her walking may trigger this reaction,
and she has to sit and use an inhaler to recover (Tr. 372).
Plaintiff indicated that these conditions caused her to stop
working on July 3, 2002 (Tr. 372-73).  As to medications,
plaintiff represented that her medicines for asthma and high
blood pressure cause her dizziness (Tr. 376).

   **6.    Disability Report-Field Office.**

   On February 11, 2003, plaintiff participated in an interview
for a Disability Report during which she claimed an alleged
disability onset date of July 3, 2002 (Tr. 379-81).  In the
observations section of the report, the interviewer noted seeing
no difficulty with plaintiff hearing, reading, breathing,
understanding, coherency, concentrating, talking, answering,
sitting, standing, walking, seeing, using her hands, or writing
(Tr. 380).

**7.  Questionnaire Supplement.**

On February 27, 2003, plaintiff completed a questionnaire in which she represented that she does no exercise, she cannot walk without being out-of-breath, she experiences gasping when walking up stairs, and she experiences sharp pain in her stomach, legs, back and wrist (Tr. 390).

**8.  Claimant Questionnaire.**

On February 27, 2003, plaintiff completed a questionnaire in which she stated that  she suffers from fatigue, shortness of breathe, dizziness, faintness, weakness, and loss of blood (Tr. 391-94).  She reported these symptoms as occurring daily (Tr. 391).  She indicated that she does the grocery shopping and all the household chores, and she drives to stores and other local points (Tr. 392-93).  Plaintiff added that when she leaves home, she must find a bathroom in case she needs one (Tr. 393). She listed her boyfriend, Ronnie Finner, without an address, as someone familiar with her condition (Tr. 394).

**9.  Statement of Claimant.**

On September 15, 2003, plaintiff provided a statement reporting that she was diagnosed with depression in March 2003 (Tr. 403-04).

**B.  *SUMMARY OF MEDICAL RECORDS FROM TRUMAN MEDICAL CENTER***

On April 6, 2002, a radiology report reflects heart size is mildly enlarged. There is suggestion of a mild right perihilar

infiltrate. Impression was borderline cardiomegaly and suggestion of right perihilar infiltrate (Tr. 462).

On April 23, 2002, spirometry testing reflected expired volume 65.9% suggesting moderate restriction of the volume excursion of the lung (Tr. 467).

On April 26, 2002, a clinic note indicates a problem list of hypertension; extrinsic asthma; dyspnea (shortness of breath) and respiratory abnormalities; and esophageal reflux. Blood pressure was at 153/109; weight was 164 pounds. Her blood pressure was too high for a stress, and her asthma was stable but too severe to use a beta blocker (Tr. 463-64).

On June 10, 2002, a stress test reflected plaintiff was exercised on a Bruce Protocol. Her initial blood pressure was 123/71. Her ECG (electrocardiogram) showed sinus rhythm and was within normal limits. Plaintiff had a resting oxygen saturation of 98% (normal). Plaintiff exercised for a total of 4 1/2 minutes, reaching a maximal HR (heart rate) of 139, less than 85% of predicted HR (heart rate) for her age. Her ECG was unchanged. During exercise, plaintiff's oxygen saturation decreased from 96 to 94 to 89. At final she had 79% oxygen saturation. Her saturation returned to normal 3 1/2 minutes into her recovery. Her maximal blood pressure was 144/93. Impression included marked oxygen desaturation with exercise and marked decreased functional capacity for age (Tr. 458).

10

On August 2, 2002, plaintiff went to Richard E. Butin, M.D., for a follow-up and tests involving her breathing problems (Tr. 454-56). She complained of feeling depressed and wanted medication for anxiety (Tr. 455). She was started on Zoloft, an antidepressant (Tr. 455).

On August 2, 2002, a clinic note shows unspecified hypertension; extrinsic asthma, dyspnea and respiratory abnormalities; and esophageal reflux. Blood pressure was 126/70. Impression included hypertension; GERD (gastroesophageal reflux disease); severe persistent asthma; allergies; and anxiety/depression (Tr. 453-55).

On August 13, 2002, a cardiology consultation reflects blood pressure was 142/86. CV (cardiovascular) indicated murmur at apex. Impression was of bi-atrial enlargement; hypertension; polycythemia 2 degrees to pulmonary dz; possible sleep apnea; childhood asthma (Tr. 450-51).

On September 6, 2002, plaintiff made no complaints concerning her depression of anxiety (Tr. 446).

On September 6, 2002, a clinic note indicates problem list of esophageal reflux; sleep apnea; dyspnea; extrinsic asthma; hypertension. Blood pressure was 126/88. Impression included hypertension; GERD; moderate persistent asthma; allergies; and anxiety/depression (Tr. 445-47).

11

On November 8, 2002, a clinic note reflects esophageal reflux; sleep apnea; dyspnea. Blood pressure was 142/103. Impression included hypertension; GERD; persistent asthma; allergies; and anxiety/depression (Tr. 438-40). Plaintiff reported that she ran out of Zoloft, but she had no complaints of depression or anxiety (Tr. 439).

On January 7, 2003, plaintiff's blood pressure was 126/84 (Tr. 550).

On February 23, 2003, plaintiff went to the hospital complaining of abdominal pain and cramping, and in the course of treatment acknowledged using **tobacco**, one pack per day (Tr. 418, 424).

In March 2003, plaintiff reported no problems with her depression (Tr. 428-30).

On March 10, 2003, plaintiff's blood pressure was 120/70 (Tr. 546).

On March 18, 2003, a clinic note shows decreased exercise tolerance, dyspnea (shortness of breath), orthopnea (difficulty breathing while lying down), paroxysmal nocturnal dyspnea (waking up suddenly during the night feeling short of breath), shortness of breath, and abdominal pain. Impression was hypertension; asthma; GERD; and depression (Tr. 428-29). Plaintiff conceded **smoking** one pack of cigarettes a day but promised to try to quit (Tr. 429).

On April 14, 2003, the note indicates that plaintiff was directed to stop **smoking** so that she could begin cyclic hormone management to deal with vaginal bleeding (Tr. 543).

On May 12, 2003, the note dealing with plaintiff's vaginal bleeding indicates that "if stops **smoking**, consider OCP's (oral contraceptive pills)" (Tr. 537).

On June 12, 2003, plaintiff went to the hospital complaining of coughing up blood, and in the assessment it records that she used **alcohol, tobacco, and marijuana** (Tr. 696).

On June 17, 2003, a radiology consultation reflects cardiomegaly with mild, vascular congestion not significantly changed since previous study (Tr. 687).

At a November 18, 2003 appointment, plaintiff had no complaints of depression or anxiety (Tr. 529). Rather, she reported that her anxiety was improved and she wanted medication to help her stop **smoking** (Tr. 530).

On November 18, 2003, notes indicate decreased exercise tolerance, dyspnea, orthopnea, paroxysmal nocturnal dyspnea and shortness of breath. Blood pressure was at 145/103. Examination of the abdomen indicated contour distended, tenderness in the epigastric region. Impression included hypertension; asthma; urinary incontinence; depression; GERD (Tr. 529-30). Plaintiff expressed a desire to quit **smoking** (Tr. 530).

13

On December 17, 2003, a radiology consultation indicates cardiomegaly and pulmonary edema which was mildly worsened since prior examination (Tr. 686).

According to a toxicology report, plaintiff's December 18, 2003, drug screen resulted in a positive for **marijuana** (Tr. 623). Plaintiff conceded to **using marijuana once a week** (Tr. 644).

On December 19, 2003, a discharge summary records that plaintiff left the hospital free of injury and with no difficulty breathing (Tr. 647).

On January 13, 2004, notes indicate blood pressure was 134/95. Plaintiff had education memory impairment; emotional barriers; concentration/judgment impairment with auditory stimuli decreased.

On January 29, 2004, notes indicate blood pressure was at 136/92 and her heart rate was 92. Patient had education memory impairment; emotional barriers; concentration/judgment impairment with auditory stimuli decreased (Tr. 513-14). Plaintiff represented that she had **quit smoking and denied any recreational drug use** (Tr. 513).

On February 26, 2004, a pulmonary function study reflects although the FEV1 (forced expiratory volume in 1 second) and FVC (forced vital capacity) were reduced, FEV1/FVC ratio was increased. The slow vital capacity was reduced. Following administration of bronchodilators, there was no significant

14

response. Conclusions were the reduction in FVC (forced vital capacity) would suggest a restrictive process. Pulmonary function diagnosis was of moderate restriction (Tr. 507).

On March 9, 2004, notes indicate blood pressure was 129/84 and plaintiff's pulse was 78 (Tr. 505). Plaintiff represented that she had **quit smoking and denied recreational drug use** (Tr. 505).

On April 13, 2004 a note reflects no reference to any complaints of depression or anxiety (Tr. 502). Plaintiff's diagnosis continued to include depression (Tr. 503).

On April 13, 2004, notes indicate stress incontinence; congestive heart failure[3]; esophageal reflux; sleep apnea; dyspnea; unspecified essential hypertension; extrinsic asthma; dyspnea and respiratory abnormalities; depression. The notes also record decreased exercise tolerance; paroxysmal nocturnal dyspnea and shortness of breath. Blood pressure was 132/92. Examination

---

[3]The term "heart failure" makes it sound like the heart is no longer working at all and there is nothing that can be done. Actually, heart failure means that the heart is not pumping as well as it should be. The body depends on the heart's pumping action to deliver oxygen- and nutrient-rich blood to the body's cells. When the cells are nourished properly, the body can function normally. With heart failure, the weakened heart cannot supply the cells with enough blood. This results in fatigue and shortness of breath. Everyday activities such as walking, climbing stairs or carrying groceries can become very difficult. Heart failure is a serious condition, and usually there is no cure. But many people with heart failure lead a full, enjoyable life when the condition is managed with medications and healthy lifestyle changes. American Heart Association, www.americanheart.org.

15

of lungs indicated faint crackles throughout. Impression included dyspnea; CHF (congestive heart failure); asthma; hypertension; GERD; and depression (Tr. 502-03). Plaintiff represented that she had **quit smoking and denied recreational drug use** (Tr. 499).

On July 13, 2004, notes reflect that plaintiff had no complaints about any psychological symptoms (Tr. 494). She continued to carry the diagnosis of depression (Tr. 495). The note shows stress incontinence; congestive heart failure; esophageal reflux; sleep apnea; dyspnea; unspecified essential hypertension; extrinsic asthma; dyspnea and respiratory abnormalities; and depression. Blood pressure was at 129/84 and her pulse was 73. The note also records edema: peripheral, paroxysmal nocturnal dyspnea, shortness of breath and wheezing. Impression was dyspnea, congestive heart failure, asthma, chronic obstructive pulmonary disease ("COPD"); hypertension; depression; and GERD (Tr. 493-95). Plaintiff was advised to stop **smoking** (Tr. 495).

On July 29, 2004, plaintiff's blood pressure was 127/93 and her pulse was 78 (Tr. 488). Plaintiff represented that she had **quit smoking and denied recreational drug use** (Tr. 488).

On August 9, 2004, plaintiff's blood pressure was 130/91 and her pulse was 70 (Tr. 484).

On September 7, 2004, a EGD (esophageo-gastroduodenoscopy) report reflects the impression of Grade 1 erosive esophagitis of

16

the distal esophagus; erosive gastritis of the body of the stomach and antrum (Tr. 476).

On September 26, 2004, an echocardiogram indicates the impression of mild left ventricular hypertrophy, overall estimated ejection fraction 50% to 55%[4]; Grade 3 diastolic dysfunction with elevated left and right atrial pressures; pulmonary hypertension; biatrial enlargement; mild mitral regurgitation, mild tricuspid regurgitation (Tr. 736-37).

On September 30, 2004, a cardiology consultation reflects the impression of restrictive cardiomyopathy as evidenced by hemodynamics; severe pulmonary hypertension; no occlusive coronary artery disease with preserved left ventricular function. This also suggested a restrictive cardiomyopathy (Tr. 747-48). **Plaintiff was advised to stop smoking and undergo an exercise program to achieve weight loss** (Tr. 733).

On October 11, 2004, plaintiff had no specific complaints concerning any psychological symptoms (Tr. 725-27). Her diagnoses

---

[4]During each heartbeat cycle, the heart contracts and relaxes. When the heart contracts (systole), it ejects blood from the two pumping chambers (ventricles). When the heart relaxes (diastole), the ventricles refill with blood. No matter how forceful the contraction, it does not empty all of the blood out of a ventricle. The term "ejection fraction" refers to the percentage of blood that is pumped out of a filled ventricle with each heartbeat. This measures the capacity at which the heart is pumping. Because the left ventricle is the heart's main pumping chamber, ejection fraction is usually measured only in the left ventricle ("LV"). A normal LV ejection fraction is 55 percent to 70 percent. www.mayoclinic.com.

17

continued to include "stable" depression (Tr. 726). Plaintiff
reported her continued use of tobacco, **smoking 1/2 pack per day**
(Tr. 725).  The notes indicate stress incontinence, congestive
heart failure, esophageal reflux, sleep apnea, dyspnea,
unspecified essential hypertension, extrinsic asthma, dyspnea and
respiratory abnormalities. Blood pressure was at 111/74. There
was edema at the bilateral lower extremities: to 5 cm above
ankles (1+, pitting, tender). Impression was of asthma and
chronic obstructive pulmonary disease, hypertension, GERD, and
depression (Tr. 725-26).

On October 20, 2004, a echocardiogram showed normal left
ventricular function with an estimated ejection fraction of 55%-
50% and biatrial enlargement with spontaneous echo contrast
visibly seen within the chambers (Tr. 738).

On October 20, 2004, a cardiac catheterization report
reflects an assessment of severe pulmonary hypertension;
hypertension; grade 3 diastolic dysfunction of the left
ventricle; polycythemia, hematocrit 48.4; and obesity (Tr. 745).
**Plaintiff was advised to stop smoking and undergo an exercise
program to lose weight** (Tr. 745).

On November 11, 2004, plaintiff's treating physician wrote a
letter concerning her cardiovascular evaluation (Tr. 750).  In
that letter, Mukesh Garg, M.D. indicates that "[plaintiff] is

18

unlikely to be able to pursue any meaningful permanent employment, at least for the time being" ( Tr. 750).

## C.   *RESIDUAL PHYSICAL FUNCTIONAL CAPACITY ASSESSMENTS*

The ALJ in plaintiff's earlier application concluded that she has the residual functional capacity to do sedentary work provided that she has the option to sit or stand and can work in a clean, environmentally controlled site, and plaintiff has the capacity to perform light, physically non-stressful work (Tr. 92-93).

The ALJ in this case concluded that plaintiff has the residual functional capacity to lift, carry, push and/or pull ten pounds occasionally or frequently; stand and/or walk for about two hours with the option to sit or stand at will during an eight-hour workday; and sit for six hours in an eight-hour workday (Tr. 33).  The ALJ also found that plaintiff is limited to working in a clean environment with no dust, fumes or gases; no working at heights, around moving machinery or hazards; no driving of automotive equipment; no working around loud noises; and no exposure to temperature extremes or high humidity (Tr. 33-34).

## D.   *SUMMARY OF TESTIMONY*

During the hearing, plaintiff and her boyfriend testified; and Lesa Keen, a vocational expert, testified at the request of the ALJ.

**1. Plaintiff's testimony.**

Plaintiff testified that she was 41 years of age at the time of the hearing and has a high school diploma with two years of college majoring in hairstyling, having last worked in that profession in 1984 (Tr. 43).

Plaintiff testified that she worked with Kansas City Parks and Recreation as a store room clerk and mail route driver (Tr. 44). She said that she lifted over 50 pounds in that job (Tr. 44). She indicated that she picked up different items from different facilities and took them to other places (Tr. 44). She reported that she did bending and stooping, stood for about four hours and sat for about four hours (Tr. 45). Plaintiff said that she also worked for a short time at Great Clips as a stylist but left that job due to becoming ill from the fumes (Tr. 46). Plaintiff said that she also worked as a school bus driver (Tr. 46).

Plaintiff reported that her typical day consists of getting up at around 10:00 am, washing, fixing something to eat, taking her medicine, and watching TV (Tr. 47). She said that she usually falls asleep watching TV, and that around 11:30 am she routinely lies down for about an hour (Tr. 48).

Plaintiff testified that she has difficulty with headaches, shortness of breath, and fatigue. She further said that she has chest pain, stomach pain, and stomach swelling due to her heart

20

not pumping properly (Tr. 49).

Plaintiff testified that she takes Lasix for her fluid build up and that she goes to the bathroom every 15 to 20 minutes (Tr. 49). She further indicated that she has to get up about four times at night to use the bathroom (Tr. 50).

Plaintiff testified that bending over to dust makes her dizzy:

> I sit down and take everything off the table and dust it and put it back on there because bending, it burns my nose a little or, well, it don't feel good, it don't feel good. It's, I'm trying to explain this but this feeling – – it burns my nose when I bend down, and it's like dizziness rush over.

(Tr. 50.) She further said that getting up out of a chair makes her dizzy explaining that, "Yes, yes, get dizzy. And, also, my legs like stiffen up, want to give out on me or something" (Tr. 50–51).

Plaintiff testified that it takes her ten to 15 minutes to do the dishes explaining that, "I have trouble standing because I don't stand very much. I don't have a whole lot of dishes, it takes me about ten, 15 minutes to do my dishes. And standing there at that time, yeah, I'll be ready to sit down when I get done" (Tr. 51).

Plaintiff testified that she has difficulty cooking explaining that, "Sometimes I'll walk off on my food and I'll burn a little, and I'll guess turn it up too high, well, I burn it a little" (Tr. 52).

21

Plaintiff testified that she will sleep four to five hours a day explaining that, "Because I'm sleeping off and on, yeah, there's no certain time that I go to sleep, I just go to sleep. Well, I'm sitting there and just nod off, I don't be trying to go to sleep, I'll be trying . . ." (Tr. 53). She also said that the medications that she is taking make her sleepy (Tr. 54).

Plaintiff testified that she wakes up about five times a night to go to the bathroom and on occasion wakes up choking (Tr. 55).

Plaintiff testified that she uses an oxygen machine at night as prescribed by Dr. Salzman at Truman Medical Center, and has used it for four years (Tr. 55). She further stated that she uses her oxygen machine during the day when she is sick with a cold or the flu, and that this occurs about two or three times a month (Tr. 56).

Plaintiff testified that her knees and ankles swell (Tr. 51).

Plaintiff testified that she had been diagnosed with sleep apnea and was given a C-Pap machine[5] at first and then was

---

[5]CPAP stands for Continuous Positive Airway Pressure. CPAP is an effective treatment for Obstructive Sleep Apnea, snoring and other sleep disorders. CPAP therapy takes place during sleep, patients wear a face mask connected to a pump (commonly refereed to as CPAP or CPAP Machine) that forces air into the nasal passages at pressures high enough to overcome any obstructions in the airway and stimulate normal breathing. The Pressure delivered into the upper airway is continuous during both inspiration and expiration.

switched to oxygen (Tr. 56-57).

Plaintiff testified that she plays games on her computer with her feet elevated in that, "It feels better. Well, when they's hanging, no, I like to have them elevated, it feels better if they is elevated" (Tr. 57). She further said that she will elevate her legs almost all day, wedging a pillow under them (Tr. 58).

Plaintiff testified that she plays cards with her mother and boyfriend during the holidays (Tr. 65).

Plaintiff testified that she gets short of breath by walking or going up stairs or walking to her car (Tr. 58). She further said that weather changes affect her breathing, explaining that, "The fall, the winter, and the summer, all the weather changes be messing with me -- if it's real hot it's worse, and if it's real cold, it even get worser, like a real (INAUDIBLE) I can't breathe anything and it'll swell, feel like your throat is swelling up to where you can't breathe" (Tr. 59).

Plaintiff testified that she has chest pains two or three times a week each episode lasting five to ten minutes (Tr. 59).

Plaintiff testified that she has difficulties with her memory explaining that, "I can't think about, getting up getting something, then when I get there I forgot about what I was going for" (Tr. 60). She further said that she has problems with depression and had crying spells, stating "When I can't do the

23

things that I used to do, I just sit there and cry because I was an independent person. Now I have to be dependent." (Tr. 60).

Plaintiff testified that she has problems with fumes and dust in that they make her short of breath and she starts wheezing (Tr. 61). She further said that she uses her inhaler four or five times a day (Tr. 61). She indicated that sometimes she has difficulty breathing when she is around people who use perfumes or aftershave lotions (Tr. 61-62).

Plaintiff testified, "It's a problem for my stomach to be as tight and swollen as it can't stop. I've got a problem with all of it. I don't like taking medicine, I don't like to be dependent on nobody. I don't know, I have so much depression." (Tr. 62).

Plaintiff testified that she sees a cardiologist, Dr. Garg, at Truman and that he has prescribed her medications for her heart and her high blood pressure (Tr. 62-63).

Plaintiff testified that she drives a car about three or four times a month, she has pain in her shoulders, and her wrists are weak (Tr. 64-65).

Plaintiff testified that she smokes four or five cigarettes a day, and does not drink or use illicit drugs (Tr. 65). She further said that she has had two emergency room visits due to her asthma (Tr. 67).

Plaintiff testified that she has difficulty with GERD and is taking Nexium (Tr. 68). She further said that she has stress

24

incontinence in that she may have "accidents"; i.e., urinate or defecate during stress (Tr. 68). She represented that she may have "accidents" three times during a week (Tr. 68-69). She further stated that she uses the restroom every 15 minutes regardless of whether she drinks water (Tr. 69).

**2.  Finner's testimony.**

Mr. Ronnie I. Finner, plaintiff's boyfriend, testified that he has known plaintiff for four years and that they live together (Tr. 70).

Mr Finner testified as follows:

> Pretty much everything she's told you is what I've seen when I'm at home, and I mean, I've been off work for two weeks so I've seen more of, of, of what I, of what she said, but like she said, she doesn't, she doesn't do any cooking because I won't let her do it because she'll, she'll burn it up. She'll be laying in the bed sleeping. That's when I'm home on weekends, so I know she doesn't cook during the day for sure because I won't let her do it because she'll lay there and she'll burn something. But, yeah, that's pretty much what she said is, is basically what happens. I mean, she stays in the bathroom a lot, sleeps a lot. I blame it on the medication, I'm not sure, I don't know what those medications are. She has had a couple of visits to the emergency room that because of the asthma or whatever she had and they kept her, I think, three days the one time, the other one, I think like she said, she was home overnight. Bloating, she can't stay up that, she can't work too long.

(Tr. 70-71.)

Mr. Finner further testified that plaintiff has difficulties with her memory and sleeping in that:

> It's kind of both, it's kind of both. But then if we go somewhere and, and or we could go somewhere and she might forget something. As far as doing things in the house, you know, she, like she said, she may clean the house and then,

25

you know, rest for 30 minutes or so and then she'll probably
fall asleep, so I, you know, I just, I just chalk it up and
just, you know, I just, sometimes it bugs me and sometimes
it don't. And she tells me it's the sickness that she has
and sometimes, you know, I, I don't think it is, but the
last, the last two and a half weeks, yeah, it's, it's, it's
been a problem.

(Tr. 71.)

### 3. Vocational expert's testimony.

Vocational expert Lesa Keen testified that plaintiff's past
relevant employment includes work as a school bus driver
(classified as semiskilled, performed at a light exertional
level); storeroom clerk (semiskilled and performed at a light
level); parts and mail driver (unskilled and heavy level);
hairstylist (semiskilled and light level); heavy equipment
operator (semiskilled and medium to heavy level) (Tr. 77-78).

The Administrative Law Judge posed this hypothetical
question:

> Let's take a 41-year-old lady, she testified to two years of
> college, I think that was in cosmetology school, but let's
> just say two years of college, who can do the full range of
> sedentary work with the following exceptions. Because of her
> asthma and the breathing problems she has, and the chest
> pains, a clean environment, relatively free of dust,
> nauseous odors, things of that nature. We're going to give
> her a sit stand option at will. Even though she didn't
> testify to any orthopedic problems, I feel that because
> she's so tired all the time, she's going to need to get up
> and walk around, okay? Because she dozes off so much we're
> not going to put her around any dangerous or moving
> machinery, and she cannot work at any job that requires any
> type of driving. She cannot work at any unprotected heights,
> and because she testified that her condition worsened with
> weather change, no extremes of hot and cold, and she has to
> be in a controlled humidity, as far as environment is
> concerned. Based on that hypothetical, in your opinion Ms.

26

Keen, and you can give me your opinion because you're the
expert according to both me and counsel, can my hypothetical
go back and do these jobs that you testified to this lady's
had over the past 15 years?

(Tr. 78-79.)

The vocational expert replied, "No, sir" (Tr. 79).

However, the vocational expert cited other jobs that such a

hypothetical person could perform including: Surveillance monitor

(750 in Missouri and 76,000 in the USA); wire patcher (800 in

Missouri and 28,000 in the USA); and sedentary unskilled cashiers

(3,200 in Missouri and 165,000 in the USA) (Tr. 79-80).

Plaintiff's counsel then posed the following question:

If we change the Judge's hypothetical and assume because of
problems with her heart which has been classified as New
York Classification 2[6], and later reclassified as New York
Classification 3 heart problems, that because of that she'd
have to lie down and rest, and probably sleep at least two
hours in a working day, would she be able to work?

(Tr. 81.)

The vocational expert replied, "No, sir" (Tr. 81).

Plaintiff's counsel then asked, "At any job?" (Tr. 81). The

vocational expert replied, "No, sir" (Tr. 81).

Plaintiff's counsel then asked, "If she had to take a break

of approximately 15 minutes every hour that would be unscheduled,

not the normal breaks, would that affect her ability to do any of

---

[6]Class II: patients with slight, mild limitation of
activity; they are comfortable with rest or with mild exertion.
Class III: patients with marked limitation of activity; they are
comfortable only at rest.

27

those jobs? Would that prevent that?" (Tr. 82). The vocational expert replied, "Yes Sir, it would" (Tr. 82).

## V.   FINDINGS OF THE ALJ

The Honorable William Horne, Administrative Law Judge, denied plaintiff's applications filed on February 11, 2003, concluding that she was not entitled to a period of disability or disability insurance benefits under the Act (Tr. 34).

At step one, the ALJ found that plaintiff has not worked since July 2, 2002.

At step two, the ALJ found that plaintiff suffers from the following severe impairments:   Asthma, sleep apnea and disorders of the heart (Tr. 33).

At step three, the ALJ concluded that these impairments alone or in combination do not meet or equal any of the Listing of Impairments (Tr. 30).

At step four, the ALJ determined that plaintiff's subjective complaints of total disability are not credible because they are not supported by the medical evidence (Tr. 31-32). Further, the ALJ ascribed little weight to the opinion of plaintiff's treating physician, Dr. Garg, because it too is inconsistent with the medical records (Tr. 32). The ALJ concluded that plaintiff has the residual physical capacity to lift and carry ten pounds occasionally or frequently; push or pull up to ten pounds occasionally or frequently; stand and walk for about two hours in

28

an eight-hour workday with the option to sit or stand at will;

sit for six hours total in an eight-hour workday; she must work

in a clean environment with no exposure to dust, fumes or gases;

no working at heights or around moving machinery or hazards; no

driving automotive equipment; no exposure to moving machinery,

temperature extremes, or high humidity (Tr. 32). With this

residual functional capacity, plaintiff cannot return to her past

employment.

At step five, the ALJ found that, based on plaintiff's

residual functional capacity and the vocational expert's

testimony, plaintiff could perform other jobs that exist in the

regional and national economy in significant numbers (e.g.,

surveillance system monitor, cashier, and wire patcher) (Tr. 32-

33).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that

plaintiff's testimony was not credible.

## A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is

primarily for the Commissioner to decide, not the courts.

Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there

are inconsistencies in the record as a whole, the ALJ may

discount subjective complaints. McClees v. Shalala, 2 F.3d 301,

303 (8th Cir. 1993); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th

Cir. 1984). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 at 1322.

1.  *PRIOR WORK RECORD*

The ALJ discounted plaintiff's credibility because she has an unstable work history with numerous job changes and significant breaks in employment (Tr. 32). My review of her

30

employment history reflects that this finding is supported by the record (Tr. 141).

## 2.   *DAILY ACTIVITIES*

Concerning plaintiff's daily activities, the ALJ discounted her claims of inability to perform virtually any activities because they are unsupported by the record (Tr. 31-32). My review of plaintiff's medical records supports this finding. Although plaintiff has a severe problem with breathing, the other medical mental health issues seem stable for the period in question.

## 3.   *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS*

The ALJ noted that plaintiff described her symptoms as including depression, asthma, sleep apnea, high blood pressure, and disorders of the heart (Tr. 29-31).

On the issue of depression, the ALJ concluded that it was not severe (Tr. 30). Based on my review of the medical records, I concur with this finding. Plaintiff has not sought or been directed to a mental health professional. The best that can be said is that she has been prescribed a medication that has stabilized her mental condition.

On the issue of asthma, the ALJ acknowledged that it is a severe problem but found that plaintiff has been exasperating the condition by refusing to follow her doctors' orders to stop smoking (Tr. 29). I also find that plaintiff is largely

31

responsible for creating her own disabling condition and therefore should not be awarded benefits on this basis. When an impairment can be controlled by treatment or medication, it cannot be considered disabling. Wheeler v. Apfel, 224 F.3d 891 (8th Cir. 2000); Kisling v. Chater, 105 F.3d 1255 (8th Cir. 1997). Failure to follow a prescribed course of medical treatment without good cause is grounds for denying an application for benefits. Id.; 20 C.F.R. § 416.930(b).

On the question of sleep apnea, the ALJ acknowledged that plaintiff was prescribed a C-PAP machine for the condition but has failed to use it over four years (Tr. 32). Instead, she testified that she uses oxygen at night while sleeping (Tr. 32). Again, this appears to be related to her pulmonary problems addressed above rather than sleep apnea. I find no fault with the ALJ's discounting this condition as disabling.

On plaintiff's blood pressure, the ALJ did not find it a severe condition contributing to disability. My review of the medical records shows that plaintiff's blood pressure has been stable for most of the time at issue in this case (Tr. 458; 453-55; 488; 484; 493-95; 505; 529-30; 546; 550). In addition, there is no evidence that plaintiff's hypertension caused any limitations in her residual functional capacity.

On plaintiff's disorders of the heart, the ALJ did not find it a severe condition contributing to disability. There is,

32

however, a letter from Mukesh Garg, M.D., dated November 11,
2004, that states in part the following:

> [Plaintiff] has shortness of breath, which on an
> echocardiogram was thought to be secondary to left
> ventricular diastolic dysfunction.  She subsequently has had
> a heart catheterization which confirms the presence of grade
> 3 ventricular diastolic dysfunction, most likely from
> restrictive cardiomyopathy, which severe pulmonary
> hypertension.  Pulmonary artery pressures were estimated as
> approximately 75 mmHg systolic.  She is apparently
> undergoing investigations to look for a potential cause of
> restrictive cardiomyopathy, such as amyloikosis,
> sarcoidosis, etc.  She will also be ruled out for possible
> constrictive pericarditis, which remains a treatable cause
> of severe left ventricular diastolic dysfunction.  At
> present, [plaintiff's] symptoms prevent her from doing any
> significant exertional activity, and due to this functional
> limitation, she is unlikely to be able to pursue any
> meaningful permanent employment, at least for the time
> being.

(Tr. 750.)

The ALJ discounted Dr. Garg's opinion as to plaintiff's
ability to pursue any permanent employment because it is
inconsistent with substantial evidence in the record and the
issue of whether plaintiff is able to pursue meaningful permanent
employment is reserved to the Commissioner (Tr. 32).  See Coleman
v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007).

The ALJ had a duty to evaluate the medical evidence as a
whole.  Casey v. Astrue, 503 F.3d 687, 691-92 (8th Cir. 2007);
Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).  While a
"'treating physician's opinion is generally entitled to
substantial weight[,] . . . such an opinion is not conclusive in
determining disability status, and the opinion must be supported

33

by medically acceptable clinical or diagnostic data.'" Casey v. Astrue, 505 F.3d at 691, quoting Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996) (quoting Davis v. Shalala, 31 F.3d 753, 756 (8th Cir. 1994)); see also 20 C.F.R. § 404.1527(d)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."). "[A]n ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." Casey v. Astrue, 505 F.3d at 692 (quoting Prosch v. Apfel, 201 F.3d 1010, 1014 (8th Cir. 2000) (quotation and citation omitted)). In considering how much weight to give a treating physician's opinion, an ALJ must also consider the length of the treatment relationship and the frequency of examinations. 20 C.F.R. § 404.1527(d)(2)(I).

My problem with Dr. Garg's statement is that he simply confirms plaintiff's problem with shortness-of-breath, opines that its cause is still unclear and under investigation, and then leaps to the conclusion that she cannot perform meaningful permanent employment "for the time being" (Tr. 750). There is nothing in the letter indicating the foundation for the doctor's opinion, whether he performed or relied on medical tests, or what

34

physical restrictions he placed on plaintiff's activities. Instead, the doctor requests that someone help plaintiff "in pursuing her daily routine[,]" whatever that means (Tr. 750).

I share Dr. Garg's belief that plaintiff has a serious problem with breathing but am also convinced that this condition is largely a function of her failure to comply with reasonable medical orders that would cost her nothing to implement. Additionally, plaintiff's problem with breathing is incorporated in the ALJ's residual functional capacity assessment, i.e., her limited ability to stand, walk, and lift.

### 4. *PRECIPITATING AND AGGRAVATING FACTORS*

The ALJ noted plaintiff's representation that she is short of breath particularly when walking up stairs but discounted this complaint because plaintiff has been non-compliant with her doctors' instructions to stop smoking (Tr. 32).

When an impairment can be controlled by treatment or medication, it cannot be considered disabling. Wheeler v. Apfel, 224 F.3d 891 (8th Cir. 2000); Kisling v. Chater, 105 F.3d 1255 (8th Cir. 1997). Failure to follow a prescribed course of medical treatment without good cause is grounds for denying an application for benefits. Id.; 20 C.F.R. § 416.930(b).

Here, plaintiff's medical records are replete with admonitions from treating physicians instructing plaintiff to stop smoking, which she has failed to follow (Tr. 429-30; 494-95;

35

497-98; 745). During the administrative hearing, plaintiff
conceded that she has failed to stop smoking (Tr. 65).
Additionally, the records include a toxicology report where
plaintiff tested positive for marijuana (which I believe it is
reasonable to infer that plaintiff smoked) and an admission that
she used marijuana about once a week. Since plaintiff's
breathing problems appear to be the most serious of the illnesses
with which she must contend, it defies logic that she should
expect the government to award her disability benefits when she
continues to exacerbate her illness. Indeed this expectation is
contrary to law, as described above.

**5.    *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION***

        The ALJ acknowledged plaintiff's complaint that her
medications cause dizziness (Tr. 31-32). The ALJ also observed
that plaintiff contends that she uses an oxygen machine in order
to sleep at night (Tr. 32). Although unaddressed by the ALJ,
plaintiff also complained about Lasix, taken for fluid build-up,
stating that it causes her to take frequent bathroom breaks
(e.g., every 15 to 20 minutes) (Tr. 49). The ALJ observed that
these side effects went largely unreported to plaintiff's
treating physicians (Tr. 31-32), and based on the absence of such
complaints in plaintiff's medical records, the ALJ concluded that
she does this by choice, not medical necessity (Tr. 32). My
review of the medical records supports this conclusion as well.

36

*6. FUNCTIONAL RESTRICTIONS*

The ALJ acknowledged plaintiff's allegations that she sleeps most of the day and has to elevate her legs most of the time, but he found that these complaints did not find their way into the medical records (Tr. 31). The ALJ also noted that plaintiff alleged that she is unable to walk or climb stairs without losing breath and has chest pain two to three times per week lasting five to ten minutes (Tr. 32). However, the ALJ concluded that plaintiff could perform sedentary work based in part on her reported daily activities including going out to the movies and going out to dinner with her boyfriend (Tr. 65), playing computer games (Tr. 57), and working on crosswords and other puzzles (Tr. 393). The ALJ also noted the inconsistency in plaintiff's hearing testimony indicating that her boyfriend did most of the cooking, shopping and housework (Tr. 53) with her earlier responses to a questionnaire in which she indicated that she prepares meals without difficulty, performed grocery shopping without assistance, drove, and did all the household chores (Tr. 392-93). Based on these factors, I concur with the ALJ's analysis and conclusion that plaintiff is capable of performing sedentary work.

*B. CREDIBILITY CONCLUSION*

Based on plaintiff's admitted daily activities, her failure to report the adverse side effects of her medication to the

37

treating physicians, her failure to seek mental health treatment, her failure to stop smoking as directed by her doctors, and the other factors discussed above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's subjective complaints of disability are not entirely credible.

## VII. HYPOTHETICAL QUESTIONS TO VOCATIONAL EXPERT

Plaintiff also complains that the ALJ failed to include her mental impairments in the hypothetical questions asked of the vocational expert at the administrative hearing. As mentioned earlier, the ALJ discounted this complaint because it was non-severe (Tr. 30). The ALJ found that plaintiff's complaints of mental limitations were unsupported by the medical records (Tr. 30). My review of the records finds substantial support for the ALJ's finding. For example, plaintiff's depression (diagnosed on August 2, 2002) was listed as stable on November 8, 2002 (Tr. 559), November 18, 2003 (Tr. 530), April 13, 2004 (Tr. 503), July 13, 2004 (Tr. 493), and October 10, 2004 (Tr. 724).

A hypothetical relied on by the ALJ need only include impairments the ALJ has found credible. Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Stormo v. Barnhart, 377 F.3d 801, 808-09 (8th Cir. 2004). Because the ALJ did not find credible plaintiff's complaints of mental limitation, the hypothetical

38

question relied upon by the ALJ need not include mental
limitations.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial
evidence in the record as a whole supports the ALJ's finding that
plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is
denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_____/s/ Robert E. Larsen_____
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 9, 2008

39